# RECORD IMPOUNDED

### NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2160-20

IN THE MATTER OF M.F.

_____

Argued February 14, 2022 – Decided June 20, 2022

Before Judges Messano, Accurso and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. ML-18-07-0048.

Kaitlin M. Kent argued the cause for appellant M.F. (Maynard Law Office, LLC, attorneys; James H. Maynard and Kaitlin M. Kent, on the briefs).

Matthew E. Hanley, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent The State of New Jersey (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Matthew E. Hanley, of counsel and on the brief).

PER CURIAM

Registrant M.F.[1] appeals from the March 30, 2021, Law Division order classifying him as a Tier III sex offender under the registration and community

---

[1] We use initials to preserve the confidentiality of these proceedings. R. 1:38-3(c)(9).

notification provisions of "Megan's Law," N.J.S.A. 2C:7-1 to -23. He contends the calculation of his risk of re-offense on the Registrant Risk Assessment Scale (RRAS) was not supported by the record. Moreover, he argues that regardless of his final calculated RRAS score, his circumstances did not justify an "outside the heartland" upward departure to a Tier III classification level or Tier III scope of notification. Because the record before us is incomplete and thus does not support M.F.'s scores under certain RRAS factors on which the trial court relied to make its determination, we are convinced the challenged order cannot stand and are constrained to vacate the order and remand for further proceedings.

I.

Preliminarily, we observe Megan's Law is intended "to protect the community from the dangers of recidivism by sexual offenders." In re Registrant C.A., 146 N.J. 71, 80 (1996); N.J.S.A. 2C:7-2(a). In fact, "[t]he expressed purposes of the registration and notification procedures [under Megan's Law] are 'public safety' and 'preventing and promptly resolving incidents involving sexual abuse and missing persons.'" Matter of A.A., 461 N.J. Super. 385, 394 (App. Div. 2019) (citing N.J.S.A. 2C:7-1). "The law is remedial and not intended to be punitive." Ibid. (citing Doe v. Poritz, 142 N.J. 1, 12-13 (1995)).

A-2160-20

In summarizing the relevant provisions of Megan's Law and the RRAS tier classification process, we note that depending on the type and time of offense, Megan's Law requires certain sex offenders to register with local law enforcement agencies and mandates community notification. In re T.T., 188 N.J. 321, 327-28 (2006) (citing N.J.S.A. 2C:7-2). Offenders from other states who relocate to New Jersey are subject to the registration requirement. N.J.S.A. 2C:7-2(c)(3).

The extent of community notification chiefly results from a registrant's designation as a Tier I (low), Tier II (moderate), or Tier III (high) offender. N.J.S.A. 2C:7-8(a), (c)(1) to (3). Tier designations reflect a registrant's risk of re-offense, as determined by a judge assessing various information, including thirteen factors referenced in the RRAS. A.A., 461 N.J. Super. at 402. If the risk of re-offense is deemed low, only law enforcement agencies likely to encounter the registrant are notified. N.J.S.A. 2C:7-8(c)(1). If the risk of re-offense is considered moderate, schools and community organizations in the community also must be notified. N.J.S.A. 2C:7-8(c)(2). But if the risk of re-offense is high, members of the public likely to encounter the registrant likewise must be notified. N.J.S.A. 2C:7-8(c)(3).

N.J.S.A. 2C:7-8(a) authorized the Attorney General to create guidelines and procedures to evaluate a registrant's risk of re-offense. See Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification Laws (Guidelines) (rev'd Feb. 2007). The Guidelines, which contain the RRAS, have been upheld by the Court. C.A., 146 N.J. at 110.

Given the need for uniformity, the RRAS was developed for the State's use "to establish its prima facie case concerning a registrant's tier classification and manner of notification." T.T., 188 N.J. at 328 (quoting C.A., 146 N.J. at 110). "[T]he [RRAS] is presumptively accurate and is to be afforded substantial weight – indeed it will even have binding effect – unless and until a registrant 'presents subjective criteria that would support a court not relying on the tier classification recommended by the Scale.'" In re G.B., 147 N.J. 62, 81 (1996) (quoting C.A., 146 N.J. at 109).

The RRAS contains four discrete categories: seriousness of the offense; offense history; personal characteristics; and community support. See State v. C.W., 449 N.J. Super. 231, 260 (App. Div. 2017) (citing In re Registrant V.L., 441 N.J. Super. 425, 429 (App. Div. 2015)). "The first two categories, '[s]eriousness of [o]ffense' and '[o]ffense [h]istory,' are considered static

categories because they relate to the registrant's prior criminal conduct." C.A., 146 N.J. at 103. The second two categories, "[c]haracteristics of '[o]ffender' and '[c]ommunity [s]upport' are considered to be dynamic categories, because they are evidenced by current conditions." Ibid. The "static factors," relating to past criminal conduct, are more heavily weighted under the RRAS than the dynamic factors. In re Registrant J.M., 167 N.J. 490, 500 (2001).

Within those categories is a non-exhaustive list of thirteen risk assessment criteria related to re-offense. C.A., 146 N.J. at 82. The "seriousness of offense" category takes into account: (1) degree of force; (2) degree of contact; and (3) age of the victim(s). Id. at 103. The "offense history" category covers: (4) victim selection; (5) number of offenses/victims; (6) duration of offensive behavior; (7) length of time since last offense; and (8) any history of anti-social acts. Ibid. The "personal characteristics" category accounts for the registrant's: (9) response to treatment and (10) substance abuse. Id. at 103-04. The final category, "community support" considers a registrant's: (11) therapeutic support; (12) residential support; and (13) employment/educational stability. Id. at 104.

"Each factor is assigned a risk level of low (0), moderate (1), or high (3), and '[t]he total for all levels within a category provides a score that is then

weighted based on the particular category.'"[2]   A.A., 461 N.J. Super. at 402

(alteration in original) (emphasis omitted) (quoting C.A., 146 N.J. at 104).  "An

RRAS score [totaling] 0 to 36 is low risk; 37 to 73 moderate risk; and 74 or

more, high risk." T.T., 188 N.J. at 329 (citing Guidelines, Exhibit E at 4; Exhibit

F).

The State bears the burden of proving, by clear and convincing evidence,

a registrant's risk to the community and the scope of notification necessary to

protect the community.  In re Registrant R.F., 317 N.J. Super. 379, 383-84 (App.

Div. 1998).  The evidence "must be 'so clear, direct and weighty and convincing

as to enable . . . a judge . . . to come to a clear conviction, without hesitancy, of

the truth of the precise facts in issue.'" In re Registrant J.G., 169 N.J. 304, 331

(2001) (quoting R.F., 317 N.J. Super. at 384).

Understanding the State is responsible for initiating the tier classification

process, the Supreme Court has "prescribed a two-step procedure for evidence

production." C.A., 146 N.J. at 83.  "In the first step, the prosecutor has the

burden of going forward with prima facie evidence that 'justifies the proposed

_____

[2] The point total for the category of "seriousness of offense," "which is designed
to predict the nature of any re-offense . . . is multiplied by five." C.A., 146 N.J.
at 104.  On the other hand, the categories of "offense history," "personal
characteristics" and "community support" "are multiplied by three, two and one
respectively." Ibid.

A-2160-20

level and manner of notification.'" Ibid. (citation omitted). "In the second step, assuming the prosecutor's burden is met, the registrant then has the burden of producing evidence challenging the prosecutor's determinations on both issues." Id. at 83-84 (citation omitted). "Once the State has satisfied its burden of going forward, the court 'shall affirm the prosecutor's determination unless it is persuaded by a preponderance of the evidence that it does not conform to the laws and Guidelines'" based upon the court's independent review of the case and its merits. Id. at 84 (quoting Doe, 142 N.J. at 32).

To dispute a proposed tier designation, a registrant can "introduce evidence at the hearing that the [RRAS] calculations do not properly encapsulate his [or her] specific case." G.B., 147 N.J. at 85. Or, the registrant may "produce[] proof, whether in the form of reliable hearsay, affidavit, or an offer of live testimony, that is sufficient to raise a 'genuine issue of material fact,' that the tier classification and the manner of notification are inappropriate." C.A., 146 N.J. at 97 (citation omitted).

In addressing a registrant's classification, the judge is free to consider reliable evidence besides the RRAS score, even if such evidence would not be admissible under our Rules of Evidence, because the "hearing process . . . is not governed by the [R]ules of [E]vidence." Id. at 83 (internal citations omitted).

7

Thus, a reviewing judge "may take into account any [credible] information available." Ibid. (citation omitted). "This may include, but is not limited to, criminal complaints not the subject of a conviction but which are supported by credible evidence, victim statements[,] admissions by the registrant, police reports, medical, psychological or psychiatric reports, pre-sentencing reports, and Department of Corrections discharge summaries." In re C.A., 285 N.J. Super. 343, 348 (App. Div. 1995) (citation omitted).

It is evident, then, that "[j]udicial determinations regarding tier classification and community notification are within the judge's discretion and based on all of the available evidence, not simply the 'numerical calculation provided by the [RRAS].'" A.A., 461 N.J. Super. at 402 (alteration in original) (quoting G.B., 147 N.J. at 78-79). In short, the trial court makes "a value judgment" and "the ultimate determination of a registrant's risk of re[-]offense and the scope of notification is reserved to the sound discretion of the trial court." G.B., 147 N.J. at 78-79 (citations omitted). With these concepts in mind, we address the underlying facts of this matter.

II.

In November 2007, while a New York resident, M.F. pled guilty to one count of "Course of Sexual Conduct Against a Child," a first-degree offense.

According to his Probation Pre-Sentence Investigation Report (PSI), M.F. had anal sex with his twelve-year-old biological daughter two to three times a month during a three-month period in 2007. The PSI noted M.F. also placed the victim's hand on his penis two to three times a month, and on one occasion, he placed his finger inside her vagina. Additionally, the PSI reflected an acknowledgment by M.F. that he had a history of mental health problems, namely Frotteurism[3] and sexual compulsion, and had contemplated suicide. Further, he admitted to a history of daily marijuana use.

In December 2007, M.F. was sentenced on the first-degree offense to a five-year prison term and a five-year period of parole supervision. While he was incarcerated, M.F. was placed on a required program list for the Department of Corrections Sex Offender Counseling and Treatment Program. M.F. did not begin sex offense treatment until August 2011. In September 2011, a counselor reclassified him as "high risk" and requested that he be moved to a "High Risk floor to be able to have more time and education to help address his complex

---

[3] Frotteurism is the act of touching or rubbing one's genitals up against a non-consenting person in a sexual manner.

A-2160-20

sexual offending behaviors."[4]  M.F. was released from prison a month later and the State contends there is no evidence he received the recommended treatment. Following his release, M.F. was classified in New York as a "Tier Three Sexually Violent Offender."

M.F. participated in "problematic sexual behaviors/sexual offense treatment" from 2012 to 2016 at Queens Counseling for Change.  In October 2016, he completed his parole supervision term.  The record reflects he did not participate in sex offender treatment after his parole supervision ended.

In 2018, M.F. moved from New York to New Jersey.  He registered with the Newark Police Department that year and again the following year.  In September 2020, the State filed a notice of proposed "Tier [III] Internet, High Risk Sex Offender" classification, including a corresponding Tier III scope of community notification, and inclusion in the New Jersey Sex Offender Internet Registry, based on M.F. having an RRAS score of 79.  The score took into account M.F.'s 2007 conviction, as well as his juvenile record, which included an arrest in 1987 for sexual offenses against two other children, ages six and "under [eleven] years old."

---

[4]  The record reflects the referral to a high-risk floor occurred approximately two weeks after M.F. "was asked to discuss [his] offense in group on 9/8/11 and gave minimal disclosure only after being prompted by the group."

M.F. objected to the State's proposed tier classification and requested an evidentiary hearing to contest the reliability and admissibility of the RRAS. Additionally, he moved for an extension of time to secure a psychological evaluation and produce an expert report. M.F. argued his overall RRAS score should have been a 49, placing him in the Tier II range. In raising this contention, M.F. claimed factors nine (response to treatment) and eleven (therapeutic support), as well as other factors used to calculate his RRAS score, were mistakenly elevated.[5]

The judge assigned to hear the case preliminarily addressed M.F.'s objections at an October 23, 2020, hearing. At that proceeding, M.F.'s counsel advised the court that her proposed expert, Dr. Sean Hiscox, had certified "the RRAS [score did] not adequately take into account [M.F.'s] extended period of time sex offense[-]free in the community."[6] Counsel urged the judge to afford her additional time to produce a formal expert report, stating such a report would

---

[5] M.F. also challenged the points assigned to him under factors five (number of offenses/victims), six (duration of offensive behavior), twelve (residential support) and thirteen (employment/educational stability).

[6] Although it appears M.F. was not charged with any sex offenses after his 2011 release from prison, the record reflects that while on parole in 2013, he was convicted in New York of "disorderly conduct." Neither party supplied us with any details about this conviction.

provide the court and the parties "with accurate information about [M.F.'s] actual current sex offense recidivism risk . . . to render an appropriate determination as to his tier classification and scope of notification." She also requested permission to supply a letter from M.F.'s previous therapist to show M.F. successfully completed "sex offense specific treatment after he was released from incarceration."

Additionally, M.F.'s counsel expressed concern over the State's requests for additional information from M.F., such as information about his housing situation. She intimated such requests could constitute an "unconstitutional burden shifting" by the State, and emphasized it was the State's burden "to present clear and convincing evidence in support of elevating . . . scores on the RRAS criteria."

The assistant prosecutor denied the State sought to shift the burden to M.F. to prove his risk of re-offense. But she explained a registrant often chose to provide information through counsel regarding the registrant's housing or employment situation, rather than have the State independently investigate these circumstances by "go[ing] out there and speak[ing] to people, . . . something that [she thought] the registrant would not want the State to be doing at this point in time."

12

The judge assured the parties he was "cognizant of the burden of proof," and observed that "in some of these categories, certainly the provision of information or the non-provision of information can be a double-edged sword that can operate either positively or negatively." The judge concluded argument by asking M.F.'s counsel to submit the information she wished to provide the State and the court so he could review it.

Six days later, the parties returned to court for a status conference, at which point M.F.'s counsel renewed her request for additional time to retain an expert to address why the RRAS score was "not an accurate or adequate measure of" M.F.'s sex offense recidivism risk. Noting M.F. "had remained for a significant period of time sex offense free in the community," she argued, "the ultimate determination of risk, taking all these factors and taking the registrant's entire history into account . . . requires an assessment grounded in current science and not on just blindly adhering to an outdated scale" — a reference to the RRAS. Further, she claimed M.F. "established [a] prima facie showing that [his] sex offense recidivism risk is not adequately captured by the RRAS."

M.F.'s attorney also referred to a letter she submitted from Larry Menzie, the Executive Director of Queens Counseling for Change. Menzie formerly treated M.F. and reported the registrant "successfully completed" sex offense

treatment.[7]  Based on Menzie's letter, M.F.'s counsel argued the score for M.F.'s therapeutic support under factor eleven should have been "a zero."  Similarly, she contended M.F.'s score for employment stability under factor thirteen should have been "a zero" because his pay stubs showed he maintained "appropriate and stable employment."

The assistant prosecutor agreed the score for factor eleven should be adjusted downward to one point, based on M.F. having engaged in therapy from 2012 to 2016.  But she disagreed he should receive zero points for this factor,

---

[7]  In pertinent part, Menzie's letter, dated October 21, 2020, stated M.F.'s last contact with the agency was in September 2016 and that M.F. was

> considered to have successfully completed problematic sexual behaviors/sexual offense treatment at the expiration of his supervision[, g]iven his positive termination of supervision and multiple years of attending problematic sexual behavior counseling.

> In session [M.F.] was cooperative, provided feedback that indicated an understanding of and openness to utilizing the materials being presented.  He was respectful towards staff and supportive of his peers.  Sessions were conducted for [sixty to ninety] minutes in a group setting led by a trained social worker supported by master's level interns.  Issues focused in the group were related to; re-entry, successfully following community supervision conditions, developing healthy support systems and identifying, understanding addressing risk factors (both individual and generalized).

pointing to the Guideline's criteria under this factor and arguing "[i]n terms of current/continued involvement, there not being an[y] gaps between treatment, [M.F.] clearly has not been in any type of treatment since 2016." Further, she argued Menzie's letter should not impact factor nine because there were "no specifics in regards to how or what [M.F.] has done in terms of addressing all his issues. It's just a mere letter." Also, the assistant prosecutor reiterated her objection to allowing M.F. more time to secure an expert report, contending if the judge granted this relief, the State would have to "evaluate that report and . . . make a determination as to whether it needs an expert . . . as well." She reasoned there was no need for an expert to explain a connection between M.F. having remained sex offense-free and his risk of re-offense, given the RRAS already accounted for this fact.

At the conclusion of the October 29 hearing, the judge reserved decision. About a month later, without further invitation from the trial court, M.F.'s counsel filed an expert report from Dr. Hiscox. Dr. Hiscox confirmed he conducted a video interview with M.F., a phone interview with M.F.'s brother, and that he reviewed M.F.'s records. Based on his evaluation, the doctor concluded M.F.'s RRAS scores under factors nine and eleven were too high, and

15

if adjusted downward, M.F. would qualify for a Tier II classification, meaning his risk of re-offense would fall in the moderate risk range.[8]

Regarding M.F.'s response to treatment under factor nine, Dr. Hiscox referred to Menzie's October 2020 letter, noting Menzie confirmed M.F. completed sex offense treatment, was "cooperative, benefitted from treatment, and discharged positively." The doctor also concluded M.F.'s therapeutic support score under factor eleven should have been lower because M.F. successfully completed sex offense treatment.

On January 5, 2021, the judge issued an order with an accompanying written opinion, finding "M.F. should be classified in Tier III, and subject to Tier III community notification and placement in the Internet Registry."[9] The

---

[8] Dr. Hiscox also opined the State's scoring on factors twelve and thirteen were inflated. He stressed M.F. had lived without incident in a basement apartment with a separate entrance since March 2018, and had maintained stable, full-time employment for over a year.

[9] The January 5 order also denied M.F.'s motion for "an extension of time to obtain an expert report, for an 'outside the heartland' tier reduction with corresponding notification restrictions, and for an evidentiary hearing," finding no further hearings or expert testimony was required. In denying these requests, the judge acknowledged "some time ha[d] passed" between when the parties last appeared in court and when his order issued, and that in the interim, M.F. supplied Dr. Hiscox's report. Although the judge opted to consider the report, he stressed the importance of adhering to the time constraints imposed for

16

judge explained "the State . . . met its burden by clear and convincing evidence to support the [RRAS] scores assigned in categories one through eight"; the judge also found M.F. was entitled to downward adjustments under factors twelve and thirteen to one and zero points respectively, and M.F.'s total RRAS score should be reduced from a 79 to a 74.

In arriving at this calculation, the judge declined to reduce M.F.'s RRAS score of six for the registrant's response to treatment or his score of three for therapeutic support, i.e., factors nine and eleven, concluding M.F.'s challenge to these scores was "more problematic." The judge referred to the State's proofs that M.F. had a "history of unsuccessful treatment, relapses requiring remedial therapeutic levels, and no current ongoing counselling in support of scores of six and three in . . . categories [nine and eleven] respectively." Further, the judge noted the State was able to highlight, "with appropriate cites to the record documents," M.F.'s "difficulties in treatment while in custody[,] including reclassification to high-risk level treatment," and his "minimal two-month treatment period prior to release." Echoing a prior argument advanced by the State, the judge added:

---

completion of judicial review of "Megan's Law Notices of Tier Classification and Notification."

The single paragraph reference by Dr. Hiscox to records of another therapist's treatment summary indicating treatment for some time period between 2012 and 2016 without detail as to the nature of the treatment, any objective measures of risk of re-offense, the basis for concluding that this treatment was successful versus the prior treatment while in custody, or an independent current assessment is insufficient for this court to find that a further reduction in either category nine or eleven is appropriate on this record.

While the judge acknowledged Dr. Hiscox's report referred to M.F.'s "prior successful treatment" as noted in the October 2020 "treatment summary by Larry Menzie," the judge stated he did not have Menzie's summary, adding, "it appear[ed] Dr. Hiscox had only the treatment summary referenced . . . rather than . . . reports."

The judge further remarked he was

> gravely concerned that the 2007 re-offense and the 1987 offenses are extremely similar involving acts of licking the registrant's penis and anal penetration of a minor female. These facts bear directly on the court's assessment of the risk of and possible nature of any future re-offense and receive substantial weight. . . . These facts could also support a Tier III designation even if M.F. were to be able to provide sufficient evidence to support a Tier II score toward the upper end of the Tier II range. The court further observes though the record evidence does not reflect the relationship, if any, between the registrant and the 1987 victims, that is, whether the victims were related and it was an incest situation, the court is highly troubled by such a similar re-offense after twenty years. If the 1987 minor was a

<u>family member</u>, the court observes without deciding, <u>then the registrant's arguments as to a lesser risk with incest as opposed to stranger situations would be significantly undermined under the facts here</u>.[10]

[(Emphasis added).]

M.F. moved for reconsideration of the January 5 order, citing the judge's failure to consider Menzie's October 2020 letter. During argument on the motion, M.F.'s counsel again asserted M.F.'s scores under factors nine and eleven should be reduced because M.F. successfully completed sex offender treatment. She also referred to a newly filed "clarifying letter" from Menzie dated January 16, 2021, which confirmed M.F. "completed sex offense specific treatment prior to when [his] parole supervision . . . ended in New York."[11]

---

[10] It is unclear which of the two minor victims from 1987 the judge intended to reference in this statement or if he meant to reference both.

[11] The January 2021 letter stated, in part:

> As detailed in . . . prior correspondence, [M.F.] did participate in, and successfully completed, problematic sexual behaviors/sexual offense treatment. He was nevertheless required to continue to participate in treatment pursuant to his conditions of supervision, which he did until his supervision expired.
>
> . . . . [M.F.] participated in group treatment sessions which were [led] at various times by me as well as by trained social workers and master's level interns, under

A-2160-20

While arguing M.F. could qualify as a Tier II offender if his scores were lowered under certain factors, M.F.'s counsel contended there was nothing "unique" about M.F.'s case to justify an upward, "outside the heartland" departure from his RRAS score to warrant classification at the Tier III level.[12]

Though the State did not oppose the judge reconsidering the January 5 order to allow for his review of Menzie's October 2020 letter, it objected to the judge considering Menzie's January 2021 letter, based on its belated submission. Additionally, the State renewed its objection to any further reductions in M.F.'s RRAS score, arguing neither of Menzie's letters detailed "what type of progress [M.F.] made in counseling, the specific issues with respect to his sexual deviancy," or "the objective measures of his risk of re-offense."

On February 19, 2021, the judge granted M.F.'s reconsideration motion, accepting counsel's representation that Menzie's October 2020 letter was filed

---

> my direct supervision. . . . Other details as to the nature and content of the treatment provided, the period over which he received treatment, and the length of the treatment sessions, are detailed in my October 21, 2020 letter.

[12] Although M.F.'s counsel initially sought to provide expert opinion supporting a downward, "outside the heartland" Tier I classification, she formally withdrew this position during argument on the reconsideration motion.

A-2160-20

with the court prior to the entry of the January 5 order. The judge also considered Menzie's January 2021 letter, but "only to the extent that it inform[ed] the court's analysis of the October 2[020] . . . letter on criterion nine and eleven." He cited to the description of these factors in the Guidelines as follows:

> 9. Response to treatment is related to likelihood of re[-]offense. All else equal, a good response to treatment indicates less risk of re[-]offense. A therapist's report is necessary to rate this criterion.
>
> Low risk example: therapist indicates good progress in sex offender specific treatment; no offenses during treatment [;]
>
> Moderate risk example: therapist indicates some progress but significant treatment difficulties; no offenses during treatment [;]
>
> High risk example: therapist indicates no current progress; one or more offenses committed while in treatment[.]
>
>    . . . .
>
> 11. Therapeutic support provides both a means of monitoring and treating the offender, both of which reduce the likelihood of offenses. The extreme categories of "current/continued involvement" and "no involvement" are self-evident. Intermittent can be scored if the individual is currently in treatment but has had a gap between prior and current treatment or attends treatment inconsistently. The offender should be scored as low risk if there is documented, bona fide

21

effort to obtain treatment, for example, being on a waiting list.

[(Emphasis added).]

The judge remarked the Guidelines were "not particularly helpful" as to what constitutes a "therapist's report" under factor nine; he also observed the Guidelines failed to specify "what such a report should contain, or the level of detail required." Further, the judge stressed M.F.'s last contact with Menzie's program was in September 2016, and Menzie's October 2020 letter made "no mention of [M.F.] completing therapy earlier than that [September 2016] date, which is essentially contemporaneous with the end of parole supervision." Hence, the judge noted, the timing of when M.F. ceased attending therapy led the State to argue that "therapy ended because it was no longer required rather than no longer clinically indicated."

Additionally, the judge stated Menzie's January 2021 letter

> provide[d] no details as to when the treatment was considered complete or how long beyond its completion the therapy continued. <u>There is no definitive conclusion that therapy is no longer clinically indicated or mention of whether any further therapy on an as needed basis would be appropriate. No underlying records or notes were provided that would shed any light on either the timeline or the clinical progress that supports the conclusion that therapy was successful</u> or that it continued solely because it was required.

[(Emphasis added).]

In denying M.F.'s request to amend his RRAS scores for factors nine and eleven, the judge expressed:

> Though the court noted in its initial decision that <u>a registrant should not be penalized for not participating in therapy where none is clinically indicated, it is unclear here whether that is the case. This detail is even more important here given the fits and starts in [M.F.]'s treatment while incarcerated</u>. . . . This registrant re-offended twenty years after the initial offenses and asserts he never received any treatment [after the initial offenses] and is differently situated now that he has received therapy. The court cannot conclusively determine whether he received treatment for the initial offenses or not. It can conclude that <u>treatment for the present offense while incarcerated was troubled, but perhaps improved while on parole.</u> There is no dispute that [M.F.] has not reoffended since release. The court declines to amend the criterion nine and eleven scores for these reasons.

> [(Emphasis added).]

Further, in recognizing the RRAS was not "an all-inclusive scale," <u>C.A.</u>, 146 N.J. at 109, and that his "ultimate determination" should not depend on "any individual criterion scoring decision on the RRAS," the judge reiterated his "grave concerns with the facts of the re-offense in [the 2007] case." He stated:

> <u>based on the specific facts of this case[,] Tier III is appropriate even if the RRAS score is in the Tier II range.</u> Here, <u>this registrant re-offended twenty years after the initial offenses. Arguably, that fact calls into</u>

question whether the RRAS score of zero in criterion seven (length of time since last offense) appropriately assesses re-offense risk for this registrant. The first two offenses were committed upon strangers based on this record. Further, all offenses were committed upon children. . . . The potential for re-offense is more likely involving children who are strangers and is more likely to occur locally in his neighborhood. That is not to say that registrant will re-offend, however Megan's Law cases always involve balancing that potential against a registrant's rehabilitation. This court finds that the length of time between offenses and that offenses were all against children warrant the Tier III designation.

[(Emphasis added).]

On March 30, 2021, the judge executed an order classifying M.F. as a Tier III offender and subjecting him to Internet notification, after finding M.F.'s final RRAS score was 74. The attachments to the March 30 order list approximately twenty exhibits considered by the judge, including an order entered in New York finding M.F. was a "Tier 3 Sexually Violent Predator," "Arrest Information for Juvenile sex offense" for each of the 1987 victims, and a "Report from 2007 offense referring to juvenile sex offenses." Also produced for the court's consideration was a "DOC Treatment [P]rogress Report," as referenced on M.F.'s RRAS. According to the RRAS summary of the report, M.F. was transferred to a "different facility" in July 2011 "so that [M.F.] could receive sex offender counseling" and in September 2011, he was moved to a "High Risk

24

floor" "so that he could have increased counseling." The progress report also stated M.F. was moved "to be able to have more time and education to address his complex sexual offending behaviors."

M.F. promptly moved for and received a temporary stay of the Tier III notification requirements. We extended the stay upon M.F.'s subsequent application, but only as to the Tier III notification requirements pending this appeal.

M.F. now raises the following arguments for our consideration:

> I. THE MEGAN'S LAW COURT ABUSED ITS DISCRETION WHEN THE COURT FAILED TO RECOGNIZE "RELEVANT, MATERIAL, AND RELIABLE" EVIDENCE THAT M.F. HAD SUCCESSFULLY COMPLETED SEX OFFENSE TREATMENT, AND THUS ERRONEOUSLY SCORED M.F. HIGH RISK ON RRAS ITEMS #9 (RESPONSE TO TREATMENT) AND #11 (THERAPEUTIC SUPPORT) (Raised Below)
>
> A. The Megan's Law Court Abused Its Discretion When It Failed to Credit "Relevant, Material and Reliable" Evidence that M.F. Had Successfully Completed Sex-Offender Specific Therapy, and Thereafter Scored M.F. high risk ("6" Points) on RRAS Item #9
>
> B. The Megan's Law Court Should Have Scored M.F. "0" Points on RRAS Item #11 As Mr. Menzie Confirmed That M.F. Had Successfully Completed Sex Offense Treatment

25

II.  THE LOWER COURT ABUSED ITS DISCRETION IN FINDING THAT IRRESPECTIVE OF M.F.'S FINAL CALCULATED RRAS SCORE, THE FACTS OF HIS CASE WARRANT AN 'OUTSIDE THE HEARTLAND' UPWARD DEPARTURE TO A TIER 3 CLASSIFICATION LEVEL AND TIER 3 SCOPE OF NOTIFICATION (Raised Below).

We review a Megan's Law registrant's tier designation and scope of community notification for an abuse of discretion.  See, e.g., In re Registrant A.I., 303 N.J. Super. 105, 114 (App. Div. 1997).  "[A]n abuse of discretion arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."  State v. R.Y., 242 N.J. 48, 65 (2020) (internal quotation marks omitted) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).  We owe no special deference to a judge's "interpretation of the law and the consequences that flow from established facts."  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

As the judge here recognized, a trial court's determination regarding tier classification and community notification should be made "on a case-by-case basis" and founded on all competent evidence available, not just the numerical calculation provided by the RRAS.  C.A., 146 N.J. at 109.  Moreover,

26                                                  A-2160-20

[i]f after reviewing the State's prima facie case, the trial court is concerned that the proposed tier classification may be inappropriate, <u>the court can, if necessary, secure its own subjective evaluations, appoint its own experts, and order further submission of documentation by the prosecutor</u>. Any classification that is inconsistent with the classification based on the Scale is subject to judicial review by either side through appeal and any finding will have to be supported on the record. Therefore, the court's findings of the appropriate tier classification and manner of notification should be clearly set forth in the record.

[<u>Ibid.</u> (emphasis added).]

We were not provided with the bulk of the exhibits referenced in the attachments to the order. That is to say, we have a truncated record with a "List of Exhibits" instead of the complete collection of exhibits themselves. Thus, we are unable to engage in a more meaningful review. <u>See</u> <u>R.</u> 2:6-1(a)(1)(I) (requiring the appellant to include in the appendix on appeal "such other parts of the record . . . as are essential to the proper consideration of the issues, including such parts as the appellant should reasonably assume will be relied on by the respondent in meeting the issues raised").

Although we are not "obliged to attempt review of an issue when the relevant portions of the record are not included," <u>Cmty. Hosp. Grp., Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C.</u>, 381 N.J. Super. 119, 127 (App. Div. 2005) (citations omitted), there are certain issues presented to us

that warrant discussion, compel us to vacate the order, and which need to be addressed on remand.

As to factor nine, the registrant's response to treatment, we agree with M.F. that he provided some evidence to the judge he successfully completed treatment, yet the judge gave the registrant a "High Risk" score, resulting in a score of six, the highest score possible, on this factor. Under the Guidelines' example, such a score is justified when a "therapist indicates no current progress; one or more offenses committed while in treatment[.]" M.F., however, furnished some evidence of having successfully completed sex offender treatment.

To support a "high-risk" score of six on factor nine, the judge pointed to "fits and starts in [the] registrant's treatment while incarcerated," "the specific facts in this case," and the lack of detail provided by M.F.'s therapist regarding treatment M.F. received after his release from prison in 2011. Because we are not privy to the full content of the exhibits the judge considered, we cannot conclude with any confidence that the State met its burden of proof justifying the maximum score on factor nine, or that the judge did not mistakenly exercise his discretion by finding M.F. presented the "Highest Risk" on factor nine.

A-2160-20

Similarly, because of the incomplete record before us, we are left to guess why the judge assessed M.F. at the highest score of three under factor eleven. This is particularly so, given the assistant prosecutor previously agreed the RRAS score on factor eleven should be adjusted downward to one point. Accordingly, while we agree with the judge's assessment that a certain level of detail to support Menzie's conclusion that M.F. "successfully completed problematic sexual behaviors/sexual offense treatment at the expiration of his supervision" was lacking, see In re J.W., 410 N.J. Super. 125, 135-36 (App. Div. 2009), as the record exists before us now, a high-risk score is not supported for either factors nine or eleven. Thus, these scores should be reevaluated upon remand.

Finally, because of the judge's contradictory findings on factor four, he may revisit this factor on remand to the extent there is new evidence in the record not previously provided to the judge. While we recognize "[t]here are extreme limitations upon modification of the assessment of one or more static factors, In re H.M., 343 N.J. Super. 219, 224 (App. Div. 2001), there is a difference between a situation where information affecting one or more static factors was not known to the judge and prosecutor, and a situation where information was known." In re R.A., 395 N.J. Super. 565, 568 (App. Div. 2007).

Importantly, we further emphasize that on remand, the court is not limited to just a consideration of the RRAS factors, but it may also consider "any other relevant evidence, including when appropriate, the views of experts." H.M., 343 N.J. Super. at 224. This is because "the court must consider the risk of recidivism in light of the then current situation." Ibid.

However, "[o]nly in the unusual case where relevant, material, and reliable facts exist for which the [RRAS] does not account, or does not adequately account, should the [RRAS] be questioned." Id. at 82; see also In re B.B. ___ N.J. Super. ___, ___ (App. Div. 2022) (slip op. at 12). Moreover, "[t]hose facts must be sufficiently unusual to establish that a particular registrant's case falls outside the 'heartland' of [Megan's Law] cases." G.B., 147 N.J. at 82.

Given our sparse record, and fully cognizant of the judge's broad discretion to deviate from the RRAS score when making a tier and notification decision, we do not suggest that M.F. should be classified in any specific Tier. We leave the conduct of the remand to the judge's discretion. He may order further submissions from the parties and elicit testimony, whether expert or lay to properly address the complex issues presented by this matter.

Pending a final order on remand, the March 30 order classifying M.F., along with our existing stay of the Tier III notifications shall remain intact.

Vacated and remanded for further proceedings in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

31

A-2160-20