# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2878-23
A-2880-23

IN RE REGISTRANT S.O.

_____

IN RE REGISTRANT G.N.

_____

APPROVED FOR PUBLICATION

July 7, 2025

APPELLATE DIVISION

Argued April 29, 2025 – Decided July 7, 2025

Before Judges Gooden Brown, Smith and Vanek.

On appeal from the Superior Court of New Jersey,
Law Division, Middlesex County, Docket Nos.
ML-04-12-0051 and ML-01-12-0048.

David M. Liston, Assistant Prosecutor, argued the
cause for appellant State of New Jersey (Yolanda
Ciccone, Middlesex County Prosecutor, attorney;
David M. Liston, of counsel; Brian D. Gillet, Assistant
Prosecutor, of counsel and on the briefs).

Laura B. Lasota, Deputy Public Defender II, argued
the cause for respondent S.O. in A-2878-23 (Jennifer
N. Sellitti, Public Defender, attorney; Laura B. Lasota,
of counsel and on the brief).

Fletcher C. Duddy, Assistant Public Defender, argued
the cause for respondent G.N. in A-2880-23 (Jennifer
N. Sellitti, Public Defender, attorney; Fletcher C.
Duddy, of counsel and on the brief; Michael R.
Noveck, Deputy Public Defender, and Julia T.
Bradley, Staff Attorney, on the brief).

The opinion of the court was delivered by

VANEK, J.A.D.

These appeals, calendared back-to-back and consolidated only for the purpose of issuing a singular opinion, present a novel issue—the statutory interpretation of the "public safety prongs" contained in the termination provisions of Megan's Law, N.J.S.A. 2C:7-2(f), and the Community Supervision for Life statute (CSL), N.J.S.A. 2C:43-6.4(c).[1]  Specifically, we determine whether, on a registrant's application to terminate Megan's Law and CSL obligations, the phrase "not likely to pose a threat to the safety of others" should be broadly interpreted with the trial court considering threats to safety from subsequent non-sexual and sexual offenses or whether the inquiry should be limited to the threat of sexual re-offense only.

Based on our thorough review and application of principles of statutory construction, we conclude that trial courts should view the public safety prongs broadly and consider the factual predicate of all subsequent non-sexual and sexual offenses, including but not limited to:  a registrant's tier

---

[1]  The Court has described the N.J.S.A. 2C:7-2(f) requirement that a registrant establish they are not "likely to pose a threat to the safety of others" to terminate their Megan's Law obligations as the "public safety prong."  See In re R.H., 258 N.J. 1, 15 (2024).  Since the CSL statute contains the identical requirement, we refer categorically to the statutory language in both N.J.S.A. 2C:7-2(f) and N.J.S.A. 2C:43-6.4(c) as the "public safety prongs."

classifications and any modification applications; Registrant Risk Assessment Scale (RRAS) scores; expert evaluations; and evidence of therapeutic programs and counseling attended to determine whether a registrant's obligations should be terminated. Accordingly, we vacate the trial court orders terminating the Megan's Law and CSL obligations applicable to S.O. and G.N. (collectively, Registrants), and remand both matters to the trial court for further proceedings in accordance with this opinion.

I.

The parties do not dispute the salient facts as detailed in the motion records on both Registrants' applications to terminate their Megan's Law and CSL obligations before the same trial court judge.

A.

<u>S.O.</u>

On November 5, 1999, S.O., then eighteen-years-old, pled guilty as an adult to two counts of aggravated sexual assault, N.J.S.A. 2C:14-2(a), subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, for sexually abusing his two male cousins three years prior, when they were nine and eleven-years-old. The trial court sentenced S.O. to six years' incarceration on count one, to serve eighty-five percent of his sentence at the Adult Diagnostic and Treatment Center, with five years of parole supervision, along with associated fines. As

3

to count two, the trial court sentenced S.O. to a concurrent six-year term of imprisonment. S.O. was also ordered to comply with Megan's Law registration requirements and CSL was imposed.

On July 6, 2004, S.O. was released from incarceration and paroled. A few months later, the trial court entered an order designating S.O. as a Tier Two sexual offender with a "moderate level of risk of re-offense,"[2] based on a RRAS score of fifty-two.[3] Approximately five years after the initial tier classification, S.O. was again classified as Tier Two, based on the same RRAS score.

---

[2] The scope of community notification is determined by a registrant's designation as Tier One (low), Tier Two (moderate), or Tier Three (high). N.J.S.A. 2C:7-8(a), (c)(1) to (3). Tier designations are indicative of a registrant's risk of re-offense as determined by the trial court's consideration of the thirteen factors in the RRAS. In re J.G., 463 N.J. Super. 263, 273-74 (App. Div. 2020).

[3] The Attorney General Guidelines provide numerous examples of a "moderate risk" offender, such as: "[O]ffender threatens physical harm or offender applies physical force that coerces but does no physical harm, for example, by holding the victim down; the offender uses verbal coercion against a child victim, for example, by telling a child victim that he will get 'in trouble' or 'won't be loved' if he tells anyone of the abuse;" and involving an "'acquaintance' [which] implies a degree of social/business interaction beyond that of a single contact and includes an offender who sexually abuses a neighbor's child, a child for whom he or she is babysitting, or a child for whom he or she is coach or teacher." Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification Laws, exhibit E at 5 (rev. 2007) [hereinafter Guidelines].

A-2878-23

On August 29, 2019, S.O. was arrested and charged with violating a multitude of motor vehicle statutes,[4] with the police report stating S.O. was driving while intoxicated and crashed his car, did not comply with police requests to conduct field sobriety testing and resisted arrest, injuring an officer in the process. S.O. pled guilty to simple assault, N.J.S.A. 2C:12-1(a)(1); resisting and eluding arrest, N.J.S.A. 2C:29-2(a)(1); driving while intoxicated, N.J.S.A. 39:4-50; and reckless driving, N.J.S.A. 39:4-96.

On August 25, 2020, the trial court once again classified S.O. as a Tier Two offender, based on an increased RRAS score of sixty-three. The record contains no evidence of any subsequent request by S.O. for tier reclassification.

Almost two years later, S.O.'s girlfriend obtained a temporary restraining order (TRO) against him pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, based on several incidents. The domestic violence complaint alleged that S.O. "attacked her while in his company van

---

[4] S.O. received the following summonses: driving while intoxicated, N.J.S.A. 39:4-50; reckless driving, N.J.S.A. 39:4-96; open/unsealed container of alcohol, N.J.S.A. 39:4-51(b); uninsured motor vehicle, N.J.S.A. 39:6B-2; failure to exhibit documents, N.J.S.A. 39:3-29; failure to maintain lane, N.J.S.A. 39:4-88; and failure to notify of a change of address, N.J.S.A. 39:3-36. S.O. was also charged with obstruction of administration of law enforcement, N.J.S.A. 2C:29-1(a); resisting arrest, eluding, and preventing officers from effecting arrest, N.J.S.A. 2C:29-2(a)(1); and disorderly conduct and offensive language, N.J.S.A. 2C:33-2(b).

where he slammed her back and lower buttocks into the dashboard, [and] then rammed her into the driver's seat screaming and yelling in her face," threatened her with a knife then "forcefully kissed and head bumped her," causing injury. Days later, S.O. dragged her out of the bathroom and into the bedroom where he forcibly removed her clothing and threw her onto the bed. He then forced himself on her and attempted to have sex with her, despite her screaming for help and pleading with him to stop. When she tried to move away from S.O., he grabbed her by the legs, "lifted her up and bit[] her vagina while saying that he was going to [f***] her." S.O. then "grabbed a knife," and threatened to kill himself if she left him.

On September 15, 2022, a final restraining order (FRO) was entered.[5] As a result, S.O. was indicted for violating CSL, N.J.S.A. 2C:43-6.4(d). He later pled guilty to an amended charge of simple assault, N.J.S.A. 2C:12-1(a)(1).

A year and a half later, Kenneth L. McNiel, Ph.D., conducted a psychological evaluation and risk assessment of S.O., largely focused on his

---

[5] The record does not evidence the trial court's finding as to the predicate act, N.J.S.A. 2C:25-19(a), that formed the basis of the FRO entered against S.O.

A-2878-23

risk of sexual recidivism.[6] McNiel asked S.O. about the underlying allegations in the TRO and the FRO, and S.O. told him "it was my fault and I can't blame her. But she was very negative very jealous, and we were too much up and down, like a roller coaster. It was unhealthy for me and it was unhealthy for her." When asked about the sexual abuse of his juvenile cousins, S.O. told McNiel, "I got messed up, and I messed up my cousins . . . . I wish I could take back the damage I did, but I can't." McNiel concluded S.O. "accepted full responsibility for his behavior, with no victim blame."

McNiel considered S.O.'s history and then-current test results, determining S.O. "present[ed] . . . as clinically stable, with a prior history of substance abuse and chronic issues with anxiety and depression associated with complex childhood trauma." McNiel's "[o]verall clinical impression is of a sincere, well-intentioned individual, who has benefitted greatly from treatment to address his offense and childhood trauma." McNiel opined that a "[f]ormal risk assessment indicates very low sexual violence risk at this time

---

[6] McNiel used the following risk assessment measures in the evaluation: SCL-90-R, a ninety-item self-report symptom checklist; Static-99-R, a ten-item assessment designed to "estimate the probability of sexual and violent recidivism among adult males who have been convicted of one or more sexual offenses;" SVR-20, a twenty-item scale used "to assess sexual violence risk for adults who have committed or been alleged to have committed a sexual offense;" and a Structure Assessment of Protective Factors for violence risk, a "[seventeen]-item checklist of dynamic protective factors . . . that can decrease the risk of violent behavior."

A-2878-23

roughly commensurate with general population risk" and S.O. "does not present a risk to the community at this time and is a good candidate to be considered for release from Megan's Law and [CSL]." While McNiel stated in his report that he reviewed S.O.'s criminal history record, along with his RRAS scores and other materials, he did not directly address S.O.'s Tier Two classification, the RRAS scores, S.O.'s subsequent arrests, or the factual predicate for the FRO.

S.O. moved to terminate his Megan's Law registration requirements and his CSL obligations. At the conclusion of a hearing, the trial court granted S.O.'s motion in an oral decision, citing In re H.D., 241 N.J. 412 (2000) and In re A.D., 441 N.J. Super. 403 (App. Div. 2015), aff'd, 227 N.J. 626 (2017), in support of its finding that the offense-free prong of N.J.S.A. 2C:7-2(f) was satisfied.[7] As to the public safety prongs, the trial court relied on McNiel's report, accepting that S.O. was not likely to sexually re-offend, without making any credibility determinations as to the expert's opinion. Although the

---

[7] The offense-free prong states the registrant must not have "committed an offense within [fifteen] years following conviction or release from a correctional facility for any term of imprisonment imposed, whichever is later . . . ." N.J.S.A. 2C:7-2(f) (emphasis added). The CSL termination provision substitutes the term "crime" for "offense." See N.J.S.A. 2C:43-6.4(c) ("[T]he person has not committed a crime for [fifteen] years since the last conviction or release from incarceration . . . .") (emphasis added).

trial court characterized the event leading to the issuance of the FRO as significant and violent sexual misconduct, it did not find the facts weighed heavily against termination since the State "minimized" the incident by amending the charge against S.O. to simple assault. The trial court did not address S.O.'s Tier Two classification, through which he posed a moderate risk of sexual re-offense based on his RRAS score of sixty-three, his failure to seek tier reclassification, his subsequent arrests, or the factual basis for the entry of the FRO.

The trial court entered an order terminating S.O.'s Megan's Law and CSL obligations, also staying its determination pending appeal. The State's appeal followed.

B.

G.N.

On September 8, 1999, G.N. was adjudicated delinquent of one count of aggravated sexual assault, N.J.S.A. 2C:14-2(a), due to his sexual abuse of a ten-year-old male acquaintance on a camping trip when G.N. was twelve-years-old. G.N. received three years of probation, entered the Bonnie Brae Residential Program, and was ordered to comply with Megan's Law registration requirements. The following year, G.N. was classified as a Tier One sex offender, based on a RRAS score of thirty-three.

We glean G.N.'s subsequent history from the limited facts in the record. In 2004, G.N. was charged with conspiracy to commit robbery and was sentenced to three years' incarceration. One year later, he was charged with possession of controlled dangerous substances (CDS) and was sentenced to six years and six months' imprisonment. He also received an eighteen-month sentence for subsequent charges of obstruction, theft and a local ordinance violation.

In 2012, he was arrested for providing a false report to a law enforcement officer and shoplifting for which he was sentenced to ninety days' incarceration, one year of probation, and monetary fines. Probation was subsequently revoked. Later that year, he was charged with conspiracy to distribute and manufacture CDS. Although the conspiracy charge was dismissed, the CDS manufacturing charge yielded three years' probation, which was subsequently revoked.

In 2014, G.N. was charged with theft, resisting arrest, and possession of CDS, resulting in a sentence of fifteen months' incarceration. In 2015, G.N. was charged with loitering which resulted in a one-hundred and eighty day suspended sentence. In 2016, G.N. was charged with theft, possession of CDS and wandering to obtain CDS, along with disorderly conduct. G.N. was ordered to pay fines and was sentenced to sixty days of incarceration. In 2017,

G.N. was charged with disorderly conduct, receiving stolen property, and theft. On July 28, 2017, G.N. was sentenced to three years' incarceration for theft, after dismissal of the remaining charges.

In February 2017, G.N. was arrested as the result of a random license plate check conducted by the police which revealed G.N. had multiple warrants outstanding for his arrest.[8]  When G.N. failed to comply with law enforcement's demands to stop his vehicle, a pursuit ensued resulting in G.N. driving off the road into a wooded area.  G.N. ultimately pled guilty to one count of second-degree resisting arrest and eluding, N.J.S.A. 2C:29-2(b), and was sentenced to a five-year term of incarceration to run concurrently with a sentence he was already serving.[9]

Approximately four years later, the mother of G.N.'s child obtained a TRO and then a FRO against him shortly after G.N. was released from prison. The predicate act for the FRO was harassment of G.N.'s child's mother, who feared for her safety because G.N. sent her "strange [and] rambling" text

---

[8]  The record before us does not include the factual basis for the issuance of the arrest warrants.

[9]  The August 2017 judgment of conviction and order of commitment resulting from G.N.'s February 2017 arrest states G.N.'s sentence in this matter "is to run concurrent with the Middlesex County sentence [G.N.] is currently serving." The record before us does not include evidence of the convictions underlying G.N.'s Middlesex County sentence.

messages, while purportedly being on drugs, and had "threatened to take their son away from her in the past." G.N. also sent "her dozens of letters and [made] phone calls, to the point where she had to put a block on his mail and phone calls with the prison."

Prior to issuance of the FRO, G.N. was criminally charged with contempt for violating the TRO, N.J.S.A. 2C:29-9A. G.N. pled guilty, and was ultimately sentenced on June 17, 2021 to probation for twelve months, given two days' jail credit, and assessed monetary penalties.

In October 2021, G.N. was classified as a Tier Two sex offender, based on a RRAS score of fifty. The record contains no evidence of any request by G.N. for tier reclassification.

In March 2023, the police pursued G.N. based upon a random DMV check which revealed he was operating an unregistered vehicle. G.N. failed to comply with police demands for him to stop the vehicle. The pursuit ensued through highways, residential areas, and several parking lots, including one where patrons were present. While traveling at a high rate of speed, G.N. made an abrupt lane change onto a ramp, struck a curb, drove in reverse and struck a police vehicle twice, then proceeded forward and drove in the wrong direction. Eventually, the vehicle, which had a flat front passenger side tire, ended up in a driveway and both G.N. and his passenger fled on foot. When

the officers caught G.N., he resisted arrest and had to be physically subdued in order to be handcuffed.

Toxicology reports showed G.N. was under the influence of norfentanyl, cocaine, and fentanyl. An officer observed in the police report that G.N. "posed an immediate threat to the safety of the public," through non-compliance with traffic laws and by striking a police vehicle. G.N. was indicted for second-degree eluding and resisting arrest, N.J.S.A. 2C:29-2(b); third-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1); fourth-degree resisting arrest and eluding, N.J.S.A. 2C:29-2(a)(2); and fourth-degree aggravated assault on a law enforcement officer, N.J.S.A. 2C:12-1(b)(5)(a). He subsequently pled guilty to second-degree eluding, N.J.S.A. 2C:29-2(b), and contempt for failure to register his address with law enforcement in compliance with Megan's Law, N.J.S.A. 2C:7-2(e). The trial court granted the State's motion for pretrial detention in part because the nature of the eluding charge was dangerous to the public.

While G.N. was detained pending trial, Sean P. Hiscox, Ph.D., evaluated him[10] and determined G.N. posed "a very low risk for committing future sex

_____

[10] Hiscox used the following assessment tools in the evaluation: Personality Assessment Inventory, an "objective personality test;" Hare Psychopathy Checklist-Revised, "an instrument that assesses personality traits and behaviors consistent with psychopathy;" and Sexual Violence Risk, "an

offenses." Hiscox reasoned in a December 12, 2023 report that G.N.'s "sexually abusive behavior likely resulted from early exposure to sex by his own sexual abuse, general immaturity due to simply being a teenager, sexual naivete, and inappropriate sexual curiosity and exploration (albeit illegal)." Hiscox also noted the underlying sexual abuse of his acquaintance "appears to have been an isolated and circumscribed incident in his life." However, Hiscox opined that "[G.N.] obviously has serious nonsexual behavioral and psychological problems," and went on to describe his recommendations for treatment. Hiscox did not directly address G.N.'s Tier Two classification and RRAS scores, his subsequent arrests and incarceration, or entry of the FRO against him.

Approximately two months later, G.N. moved to terminate his Megan's Law registration requirements. A few weeks after filing the motion, G.N. pled guilty to second degree eluding, N.J.S.A. 2C:29-2(b), and contempt, N.J.S.A. 2C:29-9(a)(2). The State consented to a ten-year flat sentence of incarceration in New Jersey State Prison for eluding, and a six-month concurrent term for contempt.

_____
empirically guided instrument that assists in assessing risk of future sex offenses for adult sex offenders."

At the time the motion to terminate was heard, G.N. awaited sentencing.[11]  On April 10, 2024, the trial court granted G.N.'s motion to terminate in an oral decision, followed by a written statement of reasons.  The trial court explained "[b]oth parties acknowledge without challenge the report of . . . Hiscox, who concluded to a reasonable degree of professional certainty that [G.N.] does not pose a threat to the safety of others in terms of sexual misconduct."[12]  Relying on In re J.G., 169 N.J. 304 (2001), the trial court found the public safety prong contemplated a trial court determination only as to whether G.N. was not likely to pose a threat to the safety of others by committing another sexual offense.  The trial court did not address G.N.'s Tier Two classification and RRAS scores, his failure to seek tier reclassification, his subsequent arrests and incarceration, or the factual basis for the entry of the FRO against him.

---

[11]  On June 6, 2024, G.N. was sentenced to nine years in New Jersey State Prison on Indictment No. 23-05-00557, and 180 days in the Middlesex County Adult Correctional Center on Indictment No. 23-06-00623.

[12]  In its opposition to the motion, the State criticized Hiscox's report, both on its incorrect focus on sexual dangerousness or the risk of sexual re-offense and the specific factual findings.  The State argued Hiscox "cannot and . . . will not conclude that [G.N.] will not re[-]offend at all.  He recognizes his inabilities to . . . stop using drugs, his long history of highly[]impulsive behavior . . . his poor judgment and . . . [using Hiscox's words] his 'callus psychopathic personality.'"

A-2878-23

The trial court granted the State's motion for a stay pending appeal. The State's appeal followed.

## II.

The threshold issue before us is whether the trial court mistakenly limited its consideration of the proofs to subsequent sexual offenses and unduly confined its analysis to whether Registrants were likely to pose a threat to the safety of others through sexual re-offense. For the reasons that follow, we conclude the public safety prongs are not to be interpreted so narrowly.

## A.

The parties do not dispute that Megan's Law is a sex-offender-registration and community-notification statute applicable to both S.O. and G.N. See N.J.S.A. 2C:7-1 to -11. CSL was also mandated for S.O. See N.J.S.A. 2C:43-6.4(a) (mandating CSL where the person has been convicted of aggravated sexual assault). We consider the Megan's Law and CSL termination provisions in tandem since "CSL is a component of the Violent Predator Incapacitation Act, which is also a component of . . . 'Megan's Law.'" State v. Perez, 220 N.J. 423, 436-37 (2015).

Under N.J.S.A. 2C:7-2(f), the provision at issue here, registrants may terminate their Megan's Law obligations upon satisfying the following statutory standard:

> Except as provided in subsection g. of this section,[13] a person required to register under this act may make application to the Superior Court . . . to terminate the obligation upon proof that the person has not committed an offense within [fifteen] years following conviction or release from a correctional facility[14] for any term of imprisonment imposed, whichever is later, and is not likely to pose a threat to the safety of others.
>
> [(Emphasis added).]

The CSL statute contains a similar provision at N.J.S.A. 2C:43-6.4(c), requiring proof by clear and convincing evidence "that the person has not committed a crime for [fifteen] years . . . and that the person is not likely to pose a threat to the safety of others" if CSL is terminated.

Recently, we confirmed:

> [N.J.S.A. 2C:7-2(f)] provides procedures by which a registrant can terminate their Megan's Law obligations, it does not create an irrebuttable presumption. Simply, except for those registrants subject to [N.J.S.A. 2C:7-2(g)], registrants can rebut any presumption of dangerousness imposed by Megan's Law by remaining offense-free for the

---

[13]  N.J.S.A. 2C:7-2(g) is inapplicable to S.O. since it became effective after S.O.'s conviction and we held it to be non-retroactive. See In re G.H., 455 N.J. Super. 515, 533 (App. Div. 2018), aff'd and remanded, 240 N.J. 113 (2019). Subsection (g) is also inapplicable to G.N. because he was adjudicated delinquent. See In re C.K., 233 N.J. 44, 48 (2018) (holding N.J.S.A. 2C:7-2(g)'s lifetime registration and notification requirements are unconstitutional as applied to juveniles).

[14]  The offense-free prong is not at issue in either of the cases before us.

statutory period and demonstrating they no longer pose a risk to their community.

[In re M.H., 475 N.J. Super. 580, 601 (App. Div. 2023), certif. denied, 256 N.J. 195 (2024).]

B.

Although we review a trial court's determination on a motion to terminate Megan's Law registration and CSL for abuse of discretion, a de novo standard of review applies to a trial court's statutory interpretation. See In re A.I., 303 N.J. Super. 105, 114 (App. Div. 1997); Verry v. Franklin Fire Dist. No. 1, 230 N.J. 285, 294 (2017). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (citing State v. Brown, 118 N.J. 595, 604 (1990)).

The court is bound to apply clearly defined statutory terms. State v. S.B., 230 N.J. 62, 68 (2017); see also Van Buren v. United States, 593 U.S. 374, 387 (2021) ("When 'a statute includes an explicit definition' of a term, 'we must follow that definition, even if it varies from a term's ordinary meaning.'") (citation omitted). Where a specific definition is absent, the court "must presume that the Legislature intended the words that it chose and the plain and ordinary meaning ascribed to those words." Paff v. Galloway Twp., 229 N.J. 340, 353 (2017) (citing DiProspero v. Penn, 183 N.J. 477, 492 (2005)).

If the plain language is unambiguous, extrinsic evidence need not be considered. Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386 (2016). "It is only when there is ambiguity in the language that we turn to extrinsic evidence, such as legislative history," to inform our determination of the Legislature's intent. Ibid.; see also Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 586 (2013).

## C.

The phrase "not likely to pose a threat to the safety of others" is not expressly defined in Megan's Law or the CSL statute.[15] Nor have we located any other New Jersey statute containing this language.

We conclude the public safety prongs are ambiguous, since they are susceptible to more than one interpretation.[16] Because the phrase "not likely to

---

[15] Statutes from other jurisdictions also contain similar language to the public safety prongs without defining the phrase. See Mass. Gen. Laws ch. 127, § 133D(b)(4); N.H. Rev. Stat. Ann. § 632-A:10-a(V)(b); 13 R.I. Gen. Laws Ann. § 13-8-32(i). We are not aware of any published Massachusetts, New Hampshire or Rhode Island decisions on the issue that might aid our interpretation.

Nevada's statute codified certain offenses where, in applying for termination of sex-offender registry notification requirements, the applicant is likely to pose a threat to the safety of others, such as if the applicant has committed "[a]n act of domestic violence," "[h]arassment, stalking, [or] threats of any kind," or the applicant has "use[d] or threatened use of force or violence." See Nev. Rev. Stat. § 176.0931(3), (5)(a)(1).

pose a threat to the safety of others" is undefined, it could be viewed as encompassing an entire spectrum of behavior warranting continuance of a registrant's lifetime statutory obligations or, as Registrants suggest, it could be viewed as limiting the inquiry to the threat of sexual re-offense under Megan's Law. Discerning ambiguity, we turn to well-settled principles of statutory construction to aid our interpretation.

We first examine the language the Legislature chose to omit in the public safety prongs, guided by the Court's application of similar principles of statutory construction in R.H. See R.H., 258 N.J. at 12-17. In reviewing the applicability of the offense-free prong in Megan's Law to juveniles adjudicated delinquent, the R.H. Court considered two subsections of Megan's Law and found the Legislature expressly imposed certain requirements in one section but did not extend those requirements in another portion of the statute. Id. at 16. As articulated by the Court, these "examples demonstrate that the Legislature made policy choices" in the way it drafted the statutes and "[t]o apply the offense-free prong . . . to all juveniles . . . would require that we imply or add language the Legislature included elsewhere . . . but left out of

_____
[16] In dicta, the R.H. Court reasoned "the public safety prong, is straightforward. It has no limiting or qualifying language and plainly applies to everyone required to register—adults and juveniles alike." R.H., 258 N.J. at 15. We do not read the Court's opinion to suggest that the public safety prong itself is unambiguous but, rather, is uniform in its application to all registrants.

A-2878-23

subsection (f). We cannot do so. We rely instead on the plain words of a statute to interpret its meaning." Ibid. (internal citations omitted).

Based on the Court's reasoning in R.H., we conclude the Legislature purposely did not include language limiting the phrase "likely to pose a threat to the safety of others" to require a trial court to consider only the threat of sexual re-offense. See ibid. As the Court did in R.H., we view the Legislature's choice of words and phrases as deliberate. To imply additional statutory language limiting the public safety prongs to the "threat of future sexual misconduct or offenses" would contravene the principles of statutory construction articulated by the Court in R.H.

D.

To the extent the language in the public safety prongs is ambiguous, we turn to extrinsic evidence for interpretive guidance. After considering extrinsic sources, we conclude the Legislature intended the public safety prongs to be interpreted broadly. Thus, a trial court is required to consider evidence of a registrant's entire subsequent history, including both sexual and non-sexual offenses, when determining whether a registrant has met its burden of proving they are not likely to pose a threat to the safety of others sufficient to warrant termination of their Megan's Law and CSL obligations, without limiting the inquiry to the threat of sexual re-offense.

A-2878-23

i.

Our interpretation of the breadth of the public safety prongs is consistent with the Legislature's express intent underpinning the enactment of Megan's Law and the CSL statute.

In promulgating Megan's Law, the Legislature found and declared:

> a. The danger of recidivism posed by sex offenders and offenders who commit other predatory acts against children, and the dangers posed by persons who prey on others as a result of mental illness, require a system of registration that will permit law enforcement officials to identify and alert the public when necessary for the public safety.[17]
>
> [N.J.S.A. 2C:7-1(a).]

The Guidelines also evidence the legislative intent in enacting Megan's Law. See Cedar Cove, Inc. v. Stanzione, 122 N.J. 202, 212 (1991) (explaining the "meaning ascribed to" Megan's Law, "including the agency's contemporaneous construction, long usage, and practical interpretation, is persuasive evidence of the Legislature's understanding of its enactment"). In the introduction to the Guidelines, the Attorney General stated Megan's Law was enacted "[i]n response to the public's demand for greater information

---

[17] Similarly, we explained N.J.S.A. 2C:43-6.4 "is designed to protect the public from recidivism by defendants convicted of serious sexual offenses. To achieve that end, it mandates, in addition to the ordinary sentence provided by the Criminal Code for the covered offenses, a special sentence of [CSL]." Sanchez v. N.J. State Parole Bd., 368 N.J. Super. 181, 184 (App. Div. 2004).

regarding the identity and whereabouts of previously convicted sex offenders who might prove a threat to the safety of those in the community." Guidelines, at 1. The Guidelines also recognized that:

> As the Supreme Court of New Jersey made clear, the purpose of this legislation is to provide pertinent information to law enforcement and, in appropriate circumstances, to neighbors, parents and children, as well as community organizations which care for or supervise women or children. It is hoped that, armed with knowledge of the descriptions and whereabouts of sex offenders and pedophiles, community members will be in the best possible position to protect their children and themselves.
>
> [Ibid.]

The Court has also recognized that Megan's Law "should be construed broadly to achieve its goal of protecting the public . . . ." State v. S.R., 175 N.J. 23, 36 (2002).

We are satisfied the Legislature did not confine its protection of the public under Megan's Law to the threat of sexual re-offense. Rather, we also glean references of an intent to protect our vulnerable population from predatory acts, generally. Thus, our conclusion that trial courts should evaluate a registrant's entire subsequent history, without limitation to the threat of future sexual offenses, when determining whether the public safety prongs are satisfied is supported by the legislative intent underpinning Megan's Law and CSL.

To the extent Megan's Law was also enacted to protect the community from sexual recidivism, our decision today is consistent with jurisprudence recognizing a connection between non-sexual offenses and the potential for sexual re-offense. We have acknowledged the potential for considering offenses that are not sexual in nature, along with minor, repeat sexual offenses, to determine whether a registrant has established they are "not likely to pose a threat to the safety of others." A.D., 441 N.J. Super. at 423-24. Subsequent acts, even if non-sexual, may establish a tendency to flout the law, and could be found by a trial court to be evidence of a threat to the safety of others. See id. at 420.

Similarly, the evaluation of non-sexual acts to predict the risk of sexual re-offense through the RRAS also lends support to our interpretation of the public safety prongs. See N.J.S.A. 2C:7-8(b)(3), (4), (5) (listing certain "[c]riminal history factors indicative of high risk of re-offense," including but not limited to whether the individual's behavior was "repetitive and compulsive," whether "the offense involved the use of a weapon, violence, or infliction of serious bodily injury," and whether "psychological or psychiatric profiles indicate a risk of recidivism"). The RRAS was "designed to provide prosecutors with an objective standard on which to base the community

24 A-2878-23

notification decision mandated by [Megan's Law] and to assure that the notification law is applied in a uniform manner throughout the State." In re C.A., 146 N.J. 71, 100-01 (1996). The RRAS is "one possible consideration" of many in determining a registrant's risk of re-offense. In re G.B., 147 N.J. 62, 78 (1996). The RRAS is explicitly "used to assess whether a registrant's risk of reoffending is low, moderate or high." A.D., 441 N.J. Super. at 407; see also In re V.L., 441 N.J. Super. 425, 429 (App. Div. 2015) ("An overall score of [zero] to [thirty-six] places an offender in Tier [One]; [thirty-seven] to [seventy-three], in Tier [Two]; and [seventy-four] to [one hundred eleven], Tier [Three].").

The RRAS contains four categories of review: seriousness of the offense; offense history; personal characteristics; and community support. See State v. C.W., 449 N.J. Super. 231, 260 (App. Div. 2017) (citing V.L., 441 N.J. Super. at 429). The categories "[c]haracteristic of '[o]ffender' and '[c]ommunity [s]upport' are considered to be dynamic categories, because they are evidenced by current conditions." C.A., 146 N.J. at 103. The "[c]haracteristics of [o]ffender" category accounts for the registrant's response to treatment and substance abuse. Id. at 103-04. The final category, "[c]ommunity [s]upport" considers a registrant's therapeutic support; residential support; and employment/educational stability. Id. at 104. The

"[o]ffense [h]istory" category covers victim selection; number of offenses/victims; duration of offensive behavior; length of time since last offense; and any history of anti-social acts. Id. at 103.

Here, our interpretation of the public safety prongs is supported by our prior decision in A.D. and the Legislature's requirement that a RRAS score be evaluated to inform the risk of re-offense under Megan's Law, based on any history of anti-social acts, along with response to treatment, therapeutic support, residential support, and employment or educational stability. The Legislature has required that, in calculating a RRAS score, a holistic assessment of a registrant's specific circumstances be conducted. Thus, the Legislature's determination through the RRAS that the risk of sexual re-offense is impacted by non-sexual offenses, including anti-social acts, supports our interpretation requiring consideration of both non-sexual and sexual offenses under the public safety prong analysis.

iii.

The legislative history of Megan's Law also supports consideration of a registrant's entire subsequent history, inclusive of non-sexual and sexual offenses. Megan's Law, as adopted, does not contain the restrictive language originally included in the introduced law, which only contemplated a registrant's risk of sexual recidivism.

26                                                                    A-2878-23

Subsection (f) of Megan's Law, as introduced on August 15, 1994, required a registrant to establish they are "not likely to commit an offense in the future." A. 84 (1994) (emphasis added). Under Megan's Law, a "sexual offense" is "[a] conviction, adjudication of delinquency, or acquittal by reason of insanity for aggravated sexual assault; sexual assault; [and] aggravated criminal sexual contact . . . ." N.J.S.A. 2C:7-2(b)(2).

Rather than requiring a registrant to establish they were not likely to commit a Megan's Law offense in the future, the Legislature adopted language that is broader, requiring a wholesale inquiry into whether a registrant has established they are not likely to pose a threat to the safety of others, sufficient to warrant termination. The prior iteration of Megan's Law shows the Legislature contemplated language limiting the trial court's evaluation to the risk of subsequent sexual offenses but ultimately chose a more expansive standard. Further, although Megan's Law has been amended a number of times since its enactment in 1994, the public safety prong has not been amended to include language limiting the inquiry to whether a registrant will sexually re-offend. See, e.g., State v. Brown, 245 N.J. 78, 81 (2021) (explaining the Legislature elevated "failure to register" from a fourth-degree offense to a third-degree offense); In re J.D-F., 249 N.J. 11, 14 (2021) (stating the Legislature codified N.J.S.A. 2C:7-2(g) in 2002).

iv.

To eliminate non-sexual offenses from the quantum of evidence a trial court should consider under the public safety prongs would be inconsistent with our analysis of the offense-free prong articulated in A.D.  We determined in A.D. the Legislature could rationally have concluded commission of a non-sex offense within the fifteen-year statutory period in subsection (f) evinces a propensity to sexually reoffend and bars the termination of the lifetime Megan's Law and CSL requirements.  A.D., 441 N.J. Super. at 419 (citing Doe v. Poritz, 142 N.J. 1, 25 (1995)); see also M.H., 475 N.J. Super. at 596.

To consider non-sexual offenses under the offense-free prongs but not under the public safety prongs would be incongruent.  Under principles of statutory construction, we are compelled to avoid inconsistent interpretations and results.  W.S. v. Hildreth, 252 N.J. 506, 518 (2023) ("Statutes must be read in their entirety.  Pursuant to traditional rules of statutory construction, 'each part or section should be construed in connection with every other part of a section to provide a harmonious whole.'") (internal citation omitted).  Conversely, requiring trial courts to consider a registrant's complete history of non-sexual and sexual offenses under the public safety prongs is consistent with our interpretation of the offense-free prong and in accordance with firmly established principles of statutory construction.

A-2878-23

We are unpersuaded by Registrants' argument that a trial court's consideration of subsequent non-sexual acts will be boundless and overinclusive, preventing termination applications from being granted. The trial court should consider, in its sound discretion, all evidence of non-sexual and sexual offenses presented to make a finding as to whether a registrant is not likely to pose a threat to the safety of others, considering the purposes of Megan's Law and CSL in reaching its conclusion.

v.

We are unconvinced that J.G., cited by the trial court, mandates a contrary conclusion in this case. In addressing a challenge to tier classification of an individual who was a juvenile at the time of the Megan's Law offense, the Court attempted to harmonize Megan's Law and the Juvenile Code, N.J.S.A. 2A:4A-20 to -92. J.G., 169 N.J. at 337. After doing so, the J.G. Court determined that juveniles adjudicated delinquent for sexual offenses committed when they were under age fourteen shall have their Megan's Law registration and community notification order terminate at age eighteen if, after a hearing, they establish by clear and convincing evidence they are not likely to pose a threat to the safety of others. Ibid. The Court found that its holding was "faithful to the rehabilitative goals of the Juvenile Code without undermining the salutary objectives of Megan's Law." Ibid.

Registrants who committed an offense either as a juvenile or as an adult may have their Megan's Law and CSL requirements terminated upon satisfying the public safety prongs. Our decision today interprets the public safety prongs, and clarifies the proofs that should be considered by a trial court, without running afoul of the rehabilitative aim of the Juvenile Code and the protective intent of Megan's Law acknowledged in J.G.

vi.

We decline to engage in a protracted constitutional analysis of the public safety prongs of Megan's Law where the issue was only tangentially raised on appeal. See State v. J.H.P., 478 N.J. Super. 262, 283 (App. Div. 2024) ("As a general rule, our courts strive to avoid reaching constitutional issues unless they are 'imperative to the disposition of the litigation.'") (quoting Strategic Env't Partners, LLC v. N.J. Dep't of Env't Prot., 438 N.J. Super. 125, 147 (App. Div. 2014)). Simply put, we are unconvinced our interpretation of the public safety prongs where a registrant seeks an exception to the lifetime obligations of Megan's Law and CSL, which have already been determined by the Court to be substantively and procedurally due-process compliant, implicates constitutional concerns. See Doe, 142 N.J. at 93 (holding Megan's Law does not infringe on Fourteenth Amendment rights); M.H., 475 N.J. Super. at 602-03 (rejecting claims of substantive due process violations

A-2878-23

predicated on presumptive lifetime obligations and community notification requirements).

III.

Since we conclude the trial court erred in granting Registrants' motions by considering the public safety prongs through the limited scope of whether there was evidence they would sexually re-offend, we vacate both trial court orders and remand for the trial court to make findings pursuant to Rule 1:7-4 consistent with this opinion, after conducting such further proceedings as it may deem necessary. The trial court shall exercise its sound discretion to determine whether to allow the parties to supplement the record with additional evidence or expert reports on remand. See Doe, 142 N.J. at 31 (explaining that consistent with the summary hearing procedures on tier classification, the trial court shall control the manner of the proceeding).

In light of the dearth of caselaw on the issue before us, we provide further guidance to trial courts conducting termination hearings. As the Court recognized in Doe, registration and community notification are presumptively lifetime requirements, unless the registrant can satisfy subsection (f), rebutting any presumption of dangerousness imposed by Megan's Law by "demonstrating they no longer pose a risk to their community." See M.H., 475 N.J. Super. at 601. This rationale is likewise applicable to CSL. Thus, a

31

registrant bears the burden of proof to establish the public safety prongs sufficient to warrant termination. See ibid. (citing N.J.S.A. 2C:7-2(f)). We are mindful of the differing burdens of proof imposed on registrants pursuing termination applications, depending on their age and the disposition of the Megan's Law or CSL offense. See In re J.M., 440 N.J. Super. 107, 116 (Law. Div. 2014) ("The 'exit ramps' off Megan's Law registration and CSL[] obligations carry differing burdens of proof.").

When addressing the public safety prong of Megan's Law in R.H., the Court explained that trial judges shall conduct a

> fact-intensive inquiry . . . [where] . . . offenders generally present psychological evaluations; proof they have successfully completed sex offender treatment, counseling, and therapy; and evidence of employment, among other things.
>
> To develop a persuasive record of rehabilitation takes time. Judges commonly look to whether an individual has made progress over a period of time both during confinement and afterward in the community.
>
> [R.H., 258 N.J. at 20 (emphases added).]

Registrants may submit certifications on their own behalf, along with supporting proofs, offering insight into their individual circumstances.

"Proof of the commission of a later offense would be relevant to assess whether a person poses a public safety risk." Ibid. Consistent with our

decision today, the factual basis for and disposition of any parole or CSL violations, along with subsequent arrests, should be qualitatively evaluated by a trial court through a wide lens to determine whether registrants have established they are "not likely to pose a threat to the safety of others," without limiting the inquiry to subsequent sexual offenses.

The trial court shall also evaluate the factual predicate for any restraining orders issued against a registrant, in determining whether they are likely to pose a threat to the safety of others. The legislative purpose underpinning the PDVA is "to assure the victims of domestic violence the maximum protection from abuse the law can provide." S.D. v. M.J.R., 415 N.J. Super. 417, 430 (App. Div. 2010) (quoting N.J.S.A. 2C:25-18). The Legislature has found "that there is a positive correlation between spousal abuse and child abuse." Ibid. In order for the trial court to issue a FRO, after finding a predicate act under N.J.S.A. 2C:25-19(a),[18] "the judge must determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence." D.M.R. v. M.K.G., 467 N.J. Super. 308, 322 (App. Div. 2021) (emphasis added); see also Silver v. Silver, 387 N.J.

---

[18] The predicate acts include, but are not limited to, assault, N.J.S.A. 2C:12-1; sexual assault, N.J.S.A. 2C:14-2; criminal sexual contact, N.J.S.A. 2C:14-3; harassment, N.J.S.A. 2C:33-4; and contempt of a domestic violence order, N.J.S.A. 2C:29-9(b), to name a few. See N.J.S.A. 2C:25-19.

33

Super. 112, 125-27 (App. Div. 2006). Thus, an examination of the facts underpinning the entry of a TRO or FRO is required to determine whether a registrant has established they are not likely to pose a threat to the safety of others—including, but not limited to, review of trial transcripts, police reports, and judicial findings of fact and conclusions of law rendered after domestic violence proceedings.

The trial court shall consider whether a registrant's contention that they no longer pose a threat to the safety of others is undermined by their tier classification, as informed through their RRAS scores. See M.H., 475 N.J. Super. at 595. This inquiry contemplates an evaluation of the risk posed by a registrant's tier classification predicated on RRAS scores, whether a registrant's RRAS scores increased after the initial tiering, and whether the registrant ever availed themselves of the statutory procedure to modify their tier designation.[19] Ibid.

As to Megan's Law and CSL termination hearings, "[t]he rules of evidence shall not apply and the court may rely on documentary presentations, including expert opinions, on all issues." Doe, 142 N.J. at 31. Where testimony is not proffered and the record is comprised of expert reports and

_____

[19] See R.H., 258 N.J. at 7 (alteration in original) ("[C]lassifications based on [RRAS] are subject to judicial review and modification on a case-by-case basis.").

A-2878-23

certifications, the trial court may accept or reject those proofs but still must assess credibility by weighing them accordingly to make the required factual findings. See State v. S.N., 231 N.J. 497, 514-15 (2018) (noting "regardless of whether the evidence is live testimony, a videotaped statement, or documentary evidence, deference is owed to the trial court's determinations of fact and credibility"); In re J.W.D., 149 N.J. 108, 117 (1997) (outlining the trial court's robust credibility determinations regarding expert witnesses). Plenary hearings shall be held in the sound discretion of the trial court to the extent there are factual disputes, requiring cross-examination of witnesses. See, e.g., Segal v. Lynch, 211 N.J. 230, 264-65 (2012) (requiring a plenary hearing to resolve "genuine, material and legitimate factual dispute[s]").

The trial court shall consider both Registrants' termination applications anew, based on our decision today. The record shows that Registrants are Tier Two offenders, posing a moderate risk of re-offense, after review of their tier classifications over the years yielded increased RRAS scores. The trial court record is devoid of factual findings related to the increased RRAS scores, the risk tethered to their present tier classifications, and whether subsequent applications were filed seeking to lower Registrants' tier designations. Nor does the record contain evidence that credibility determinations were made as to the expert opinions proffered by Registrants. The trial court shall also

consider the factual underpinnings of the FROs entered against Registrants, along with any parole or CSL violations, evidence of subsequent non-sexual or sexual offenses, and other relevant facts as to the Registrants' status at the time the motions were filed.

Based on a complete record, the trial court shall determine whether Registrants have met their respective burdens of establishing they are each "not likely to pose a threat to the safety of others," sufficient to terminate their Megan's Law and CSL obligations. We express no opinion on the outcome of the motions on remand. To the extent the trial court orders granted the State's applications to stay pending this decision, those stays are vacated as moot in light of our decision vacating the termination orders and remanding both matters to the trial court.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division